# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

PALERMO VILLA, INC.,

       Plaintiff,

v.

I.J. WHITE CORPORATION,

       Defendant/Third Party Plaintiff,

v.

KUHLMAN INCORPORATED,

       Third Party Defendant.

Case No. 21-CV-516-JPS

**ORDER**

## 1.  INTRODUCTION

The above-captioned matter, which proceeds in this Court on diversity jurisdiction, has been pending since April 21, 2021, ECF No. 1, and was originally set for a jury trial on January 23, 2023. ECF No. 35. As pertinent to the present motion, Plaintiff Palermo Villa, Inc. ("Palermo's") alleges in the Complaint that Defendant I.J. White Corporation ("IJW") breached its agreement with Palermo's by failing to provide a Spiral Freezer capable of meeting Palermo's required specifications to freeze parbaked rising pizza crusts to an exit temperature of 0°F ± 10°F, at the rate of 150 crusts per minute. ECF No. 1 at 4, 6. The Complaint states that Palermo's "provided no other specifications for the design of the Spiral Freezer" besides these figures, and that "all other specifications for the Spiral Freezer"—including the dwell time, or how long the crusts would need to

be in the Spiral Freezer to achieve Palermo's desired end product—"were created, established, designed, provided, and calculated by [IJW.]" *Id.* at 6. IJW disputes this contention and argues that the parties' agreement vested Palermo's with a contractual responsibility to specify the dwell time for the rising crusts (and to perform testing, as necessary, to determine that figure). *See generally* ECF No. 49; *see also* ECF No. 6 (IJW's Answer and Affirmative Defenses).

On December 15, 2022, the parties filed various pretrial motions, including competing motions in limine by Palermo's and IJW regarding interpretation of their contract, ECF Nos. 45 and 54, and a joint memorandum of law thereto, ECF No. 49. Palermo's and IJW, through these motions in limine, each ask this Court to (1) adopt an interpretation of the contract governing their transaction that is favorable to it and (2) accordingly exclude or permit the introduction of certain evidence at trial. Upon review of these motions in limine, the Court converted the trial date to a motion hearing. ECF No. 78 at 2. On January 24, 2023, the Court heard oral argument on the motions, including extensive details about the development of the parties' agreement. ECF Nos. 80, 81. Upon consideration of the parties' submissions and oral argument, and for the reasons stated in the balance of this Order, the Court will grant Palermo's motion in limine in part and deny IJW's motion in limine. The Court does not, however, adopt either party's proffered interpretation of the contract, the interpretation of which will remain for the jury's consideration.

## 2.    RELEVANT FACTS[1]

In 2018, Palermo's sought bids for a new bakery line to be installed at its manufacturing facility, which would incorporate a large spiral blast freezer as part of the design. The new bakery line would enable Palermo's to make[2] its own rising crusts to be used in manufacturing frozen pizzas. Prior to the new bakery line, Palermo's had never before made rising crusts in-house but instead had always purchased rising crusts from third-party vendors.

Representatives from Palermo's and IJW began discussing IJW designing and installing a new IJW Ultra Series Blast Freezing System (the "Spiral Freezer") as part of the bakery line. Before engaging with IJW on the Spiral Freezer project, Palermo's had other, preexisting spiral freezers in its manufacturing facility, but those freezers were used for handling different products; Palermo's sought IJW's Spiral Freezer specifically to handle the house-made rising crusts. *See* ECF No. 81 at 85. IJW had no experience with Palermo's rising crust product and did not have access to the rising crust product to conduct testing at its own facility for the Spiral

---

[1] The Court adopts the parties' statement of facts from their joint memorandum to the extent those facts are relevant to the disposition of their motions in limine, with edits made and internal citations omitted for brevity. ECF No. 49 at 2–14. Additional facts that were discussed during oral argument are included where applicable, and cited to the oral argument transcript, ECF No. 81, and additional citations to the record are made where necessary.

[2] As further clarified in oral argument, the bakery line was to be all-inclusive and would allow Palermo's to create, proof, and shape pizza dough into Rising Crusts, bake or parbake those rising crusts, and then freeze them so that toppings could be added and the rising crusts could later be packaged for retail. *See* ECF No. 81 at 75.

Case 2:21-cv-00516-JPS    Filed 02/17/23    Page 3 of 25    Document 84

Freezer. *See id.* at 84–85. In other words, both parties were endeavoring to create products they had never made before.

Early discussions took place between Robert Amacker, a sales engineer at IJW, and Greg Moranski, an engineering project manager at Palermo's. As part of these discussions, Mr. Amacker asked Mr. Moranski if Palermo's had determined a requested dwell time for the rising crusts. The dwell time is the amount of time the crusts remain in the Spiral Freezer before exiting at the desired temperature range. Mr. Moranski responded by asking:

> Wouldn't that depend on the largest crust (biggest mass per hour)? I can give you current dwell times for different spirals but do you have a point of view? I know that some are 18 minutes, others (DiGiorno) is 60 minutes.

Mr. Amacker replied:

> I have a point of view but you need to tell me how you want it. Right now I can get 40 minutes without changing heights or narrowing the tier pitch or increasing the footprint. There are levers I can pull to modify the design to get the dwell time you want. Just let me know what dwell time and I can make it happen.

Mr. Moranski then responded:

> I am assuming 30 minute max would be a want. Let[']s talk more on what that does to your design. Thanks.

IJW then proceeded to prepare its bid for the Spiral Freezer.

In March 2019, after receiving several different proposals from IJW and other spiral freezer manufacturers, Mr. Moranski informed Mr. Amacker that Palermo's wanted to move forward in the process and sought a final design and quote from IJW to inform Palermo's final vendor

selection and purchase. On May 20, 2019, Mr. Amacker presented Mr. Moranski with Quote No. H316Z Q06 (the "Quote"). The Quote was IJW's sixth revision of its proposal for the Spiral Freezer. The Quote included a section on production specifications, which provided in part:

**PRODUCT INFORMATION**

We propose to furnish an *I.J. WHITE BLAST FREEZING SYSTEM* based on the following design parameters:

**PRODUCT SPECIFICATION SHEET**

| Product Name | Leading Edge in | Length in | Weight Piece Oz | Pieces per Minute | Product Rate lbs/hr | Pieces Across Belt | Requested Retention Time |
|---|---|---|---|---|---|---|---|
| 008-11.25" Rising Crust | 11.375 | 11.375 | 19 | 150 | 10,688 | 3 | 25 |
| 074-11" Rising Crust | 11.375 | 11.375 | 19 | 150 | 10,688 | 3 | 25 |
| 084-11" Rising Crust | 11.50 | 11.50 | 18.25 | 150 | 10,266 | 3 | 25 |
| 378-11.25" Rising Crust | 11.75 | 11.75 | 19.5 | 150 | 10,969 | 3 | 25 |
| 204-11" Rising Crust | 11.375 | 11.375 | 18.85 | 150 | 10,603 | 3 | 25 |
| 077 Parbaked | 11.875 | 11.875 | 7.75 | 150 | 4,359 | 3 | 25 |
| 043-12" Parbaked | 12.125 | 12.125 | 8.15 | 150 | 4,584 | 3 | 25 |

| | Rising Crust | Parbaked |
|---|---|---|
| Est. Temperature In: | +110°F | +200°F |
| Est. Temperature Out +/- 10°F (7°C) Equilibrated: | 0°F | 0°F |

The System design is based only on the Product Information listed above and the maximum height of the product around 1.125". The Driver products for the system are the Parbaked Crusts at 25 minutes freezing time requested by Palermo. The Products must be presented to the I.J. White System in a continuous flow, free of slug gaps. Product testing can be performed to determine actual freezing time and confirm system size and price. Any additional products must be confirmed in writing to I.J. White.

The Quote therefore provided that the "requested retention time" (i.e. the "dwell time") was 25 minutes for all crust types. Although the Product Specification Sheet copied above stated that "Product testing can be

performed to determine actual freezing time and confirm system size and price" it did not state who would perform any such testing.

The Quote also included a two-page section titled "WARRANTY, TERMS, AND CONDITIONS" (the "IJW Quote T&Cs"), as well as IJW's standard form "Terms and Conditions of Sale" (the "IJW Standard T&Cs"). This Quote, and the ongoing effect, if any, of the attached sets of Terms and Conditions, are central to the parties' dispute in the present motion.

On May 24, 2019, Mr. Moranski informed Mr. Amacker that Palermo's conditionally had selected IJW for the Spiral Freezer project. Mr. Moranski indicated that Palermo's decision to award the bid for the Spiral Freezer project to IJW was contingent on the parties agreeing on Terms and Conditions for the sale:

> Bob . . . as long as we can get our way through the T&C's discussion quickly, we are pleased to announce that we have selected IJ White for the spiral freezer in our new Bakery Project.   At this time I could write the PO but will need IJ White to complete its review of the T&C document I sent you for any comments first. Once we can align, I will be able to issue the PO . . . .

Mr. Moranski and IJW's Chief Financial Officer, Joyce Bridges, then negotiated a set of Terms and Conditions (the "Palermo's T&Cs") over phone and e-mail between May 24, 2019 and June 28, 2019, making changes to the Palermo's T&Cs to the satisfaction of both parties. On June 28, 2019, Ms. Bridges told Mr. Moranski: "Yes, we accept the Terms and Conditions."

After receiving IJW's June 28 email from Ms. Bridges accepting the negotiated Palermo's T&Cs, Mr. Moranski emailed Mr. Amacker a package of documents, which for purposes of this motion the Court will treat as the

parties' contract.[3] This package of documents included: (1) Palermo's Purchase Order for the Spiral Freezer; (2) a signed letter of agreement (the "Letter"); (3) the Palermo's T&Cs that had been agreed upon by the parties; and (4) several Exhibits to the Palermo's T&Cs. The email from Mr. Moranski stated in relevant part:

> Bob, the day has finally arrived!! Thank you so much for the hard work in getting to this point on the spiral freezer! I present to you the completed purchase order for the spiral freezer quoted. You will find the following attachments:
>
> - Purchase Order
> - Letter of agreement that needs to be signed by IJ White and returned to myself for filing.
> - Agreed to Term's [sic] and Conditions
> - Copies of the Exhibit A-D for your reference knowing that we used them to complete the final quote . . .
>
> Again, thank you for continuing to be such a valuable partner to Palermo's and we look forward to working together with IJ White!

The Letter which was included in Mr. Moranski's June 28 emailed package of contract documents stated:

> Dear Bob:
>
> This letter (the "Letter") sets forth our understanding regarding products (the "Products") to be provided to Palermo Villa, Inc. ("Palermo") by IJ White Systems. ("you"),

---

[3]The parties agree this set of documents governs their transaction, i.e., serves as their contract for the sale of a Spiral Freezer. They disagree, however, about whether the IJW Quote T&Cs—which, as noted above, were attached to the Quote and to later addenda to the parties' agreement—are integrated into their contract and, to the extent there are conflicts between the June 28 package of documents and the IJW Quote T&Cs, which provisions prevail. The substance of the IJW Quote T&Cs is recounted as relevant in Section 4.2 *infra* but is not included here because it is not relevant to whether the parties' contract itself is ambiguous.

Case 2:21-cv-00516-JPS   Filed 02/17/23   Page 7 of 25   Document 84

as more fully described on the following attached documents: (i) the purchase order (the "Order"); (ii) the quote (the "Quote"); and (iii) the Palermo Villa, Inc. Terms and Conditions of Purchase (the "Terms").

The Order and Quote set forth the Products to be provided by you and the prices for the Products (the "Price"). The Order and Quote also set forth the agreed to timeline and delivery information for the Products. The payment terms for the Price are as established on the Terms.

The agreement between us is governed by this Letter, the Order, the Quote and the Terms, and pursuant to Section I of the Terms, no other terms or conditions apply to our agreement. To confirm your agreement with the foregoing and your intention to be bound by this Letter and all attachments, please sign and return one copy of this letter to Greg Moranski. […]

The "Terms" referred to in the Letter, and attached as part of the June 28 email, were the Palermo's T&Cs. They contain a section entitled "Controlling Provisions," which states in its entirety:

1.  **Controlling Provisions**

    **Generally:** The terms and conditions of this document, including the provisions on the Order, Quote and Letter, as such terms are defined in the Letter to which these terms and conditions are attached to (the "Contract"), govern the parties' duties, obligations and relationship with respect to the sale by the vendor described in the Letter ("Seller") and the purchase, acceptance and use by PALERMO VILLA, INC. ("Buyer") of the goods and/or services described in the Order (the "Products"). This Contract constitutes an offer by Buyer to buy the Products from Seller in accordance with the terms herein. Seller shall manufacture, produce, deliver and provide the Products in conformance with the Palermo Villa, Inc. Electrical and Control Systems Design/Build Standard attached as **Exhibit A**, the Palermo Villa, Inc. Factory Acceptance Test Standard attached as **Exhibit B**, the Palermo Villa, Inc. Mechanical Design/Build Standard attached as **Exhibit C**, the PVI Sanitary Design Procedure attached as **Exhibit D**, the specifications on the Order, the specifications on the Quote, and any other specifications or quality standards attached to the Letter or provided by Buyer to Seller (collectively, the "Specifications"). In the event of a conflict between the Exhibits, these terms, the Order and/or the Quote, the documents will have the following order of precedence, unless and only to the extent expressly provided to the contrary elsewhere: (1) the Order; (2) the Quote; (3) the Exhibits; and (4) these terms. If this document is deemed an acceptance of a prior offer by Seller, such acceptance is limited to the express terms and conditions contained herein and in the Specifications. Buyer's acceptance of this offer is limited to the terms, covenants and conditions herein, including the Specifications. Buyer hereby objects to and rejects any additional, different or varying terms proposed by Seller, except additional warranties by Seller, regardless of whether such terms would materially alter these terms and conditions. Seller's proposal of additional or different terms shall not operate as a rejection of Buyer's terms unless such variances are in the description, quantity, price, or place or date of delivery of Products, and Buyer's terms shall be deemed accepted without said additional or different terms. **THIS CONTRACT CONSTITUTES THE FINAL WRITTEN EXPRESSION OF THE TERMS BETWEEN BUYER AND SELLER REGARDING THE PRODUCTS AND IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THOSE TERMS. ANY TERMS, CONDITIONS, NEGOTIATIONS OR UNDERSTANDINGS BETWEEN THE PARTIES WHICH ARE NOT CONTAINED HEREIN SHALL HAVE NO FORCE OR EFFECT UNLESS IN WRITING AND SIGNED BY BUYER AND SELLER, EXPRESSLY STATING THEIR INTENT TO MODIFY THESE TERMS AND CONDITIONS.**

    **Acceptance:** Seller shall be deemed to have made an unqualified acceptance of this Contract upon execution of the Letter.

    **Governing Law:** This Contract shall be governed by and construed according to the internal laws of the State of Wisconsin, including, without limitation, the Uniform Commercial Code as adopted in Wisconsin. This Contract and purchases hereunder shall not be governed by the provisions of the United Nations Convention on Contracts for the International Sale of Goods. Any claim allegedly arising from or related to the terms of this Contract or the relationship of the parties shall be negotiated by Buyer and Seller in good faith. If agreement has not been reached within 30 days of notification of claim to a party, either party may submit the dispute to JAMS for mediation. Both parties hereby irrevocably admit themselves to and consent to the jurisdiction of Court in State of Wisconsin should resolution not be reached through mediation.

    **Severability; Wavier:** The invalidity or unenforceability of any term or condition of this Contract shall not affect the validity or enforceability of the remainder of this Contract. Buyer reserves the right to correct clerical or similar errors relating to any terms of this Contract. The failure of either party to insist, in any one or more instances, upon performance of any term, covenant or condition of this Contract shall not be construed as a waiver or relinquishment of any right granted hereunder or of the future performance of such term, covenant or condition.

The Quote itself as it was reproduced in the package of documents emailed from Palermo's to IJW on June 28, 2019, includes only the Product Specification Sheet and the trailing notation that specifies that "[p]roduct testing can be performed to determine actual freezing time and confirm system size and price" without specifying which party is to perform testing. *See* ECF No. 47-7 at 45. The IJW Quote T&Cs were not attached the Quote as it was reproduced in the June 28 package of documents. *See id.*

Page 9 of 25

On November 25, 2019, after the parties agreed to modify the Cancellation and Termination provisions of the Palermo's T&Cs, a revised final form of the Palermo's T&Cs were agreed upon, and Ms. Bridges fully executed the June 28 Letter.

Before the parties' contract was fully executed and across the fall of 2019, the parties executed seven change order addenda to their agreement. IJW prepared these change order addenda and attached to each addendum a set of the IJW Standard T&Cs. Each time IJW attached the IJW Standard T&Cs to a change order addendum, Mr. Moranski crossed them off and either attached the Palermo's T&Cs or made a notation referencing the Palermo's T&Cs. ECF No. 81 at 51–54. Mr. Moranski testified that IJW never responded to any of his notations rejecting the IJW Standard T&Cs or referencing the Palermo's T&Cs. *Id.* at 53. The parties agree that all of these executed change order addenda became part of the parties' contract, but dispute whether the IJW Standard T&Cs attached thereto, and which Palermo's crossed off, became part of the parties' contract as well.

3.      **LEGAL STANDARD[4]**

3.1      **Relevance of Evidence to Be Presented at Trial**

A district court has broad discretion in ruling on evidentiary questions presented before trial through motions in limine. *Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002). "A district court's power to exclude evidence in limine derives from its authority to manage

---

[4]The parties' motions in limine explicitly ask the Court to engage in contract interpretation, and functionally stand in for a dispositive motion. This leaves the Court to determine how two very distinct legal standards ought to apply and fit together.

trials." *Allen v. Am. Cyanamid Co*, No. 11-CV-0055, 2021 WL 1092804, at *1 (E.D. Wis. Mar. 22, 2021) (citing *Luce v. United States*, 469 U.S. 38, 41, n.4 (1984)).

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

### 3.2 Contract Interpretation

"[T]he construction of a contract is a matter of law." *Elkhart Lake's Rd. Am., Inc. v. Chi. Hist. Races, Ltd.*, 158 F.3d 970, 972 (7th Cir. 1998) (applying Wisconsin law).[5] "Contract interpretation generally seeks to give effect to the parties' intentions. . . . However, subjective intent is not the be-all and end-all. . . . Rather, unambiguous contract language controls contract interpretation." *Tufail v. Midwest Hosp., LLC*, 833 N.W.2d 586, 592 (Wis. 2013) (internal citations and quotation marks omitted). "We presume the parties' intent is evidenced by the words they chose, *if* those words are unambiguous." *Id.* (citation omitted, emphasis added).

---

[5] The parties agree that contract interpretation is governed by Wisconsin law. The Palermo's T&Cs, which Palermo argues exclusively govern, explicitly call for application of Wisconsin law. *See* ECF No. 49 at 8. Additionally, the parties agree that Wisconsin substantive law governs the case pursuant to the *Erie* doctrine. *Id.* at 15.

Case 2:21-cv-00516-JPS   Filed 02/17/23   Page 11 of 25   Document 84

However, "[w]hen a contract provision is ambiguous . . . the question is one of contract interpretation for the jury." *Mgm't Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 557 N.W.2d 67, 75 (Wis. 1996); *see also Town Bank v. City Real Est. Dev., LLC*, 793 N.W.2d 476, 484 (Wis. 2010). "A contract provision is ambiguous if it is fairly susceptible of more than one construction." *Mgm't Computer Servs.*, 557 N.W.2d. at 75. "Contract language is construed according to its plain or ordinary meaning . . . . For a business contract, that is the manner that it would be understood by persons in the business to which the contract relates." *Tufail*, 833 N.W.2d at 593 (internal citations and quotation marks omitted). "If the terms of the contract are ambiguous, evidence extrinsic to the contract itself may be used to determine the parties' intent." *Id.* at 592.

## 4. ANALYSIS

The parties summarize their disagreement in their joint memorandum as follows:

> The parties disagree about the interpretation of their contract. In particular, Palermo's contends that the Palermo's T&Cs are controlling and govern the contract, and [IJW] disputes that. The parties also dispute who was contractually responsible for determining the dwell time needed inside the Spiral Freezer for the Rising Crusts to reach the contract-specified discharge temperature range of 0°F ± 10°F. [IJW] contends the contract made Palermo's responsible for the dwell time, and that is why Palermo's performed dwell time testing. [IJW] further contends that the testing performed by Palermo's gave erroneous results. Palermo's disputes those contentions and asserts that [IJW] was contractually responsible to design the Spiral Freezer to achieve the specified discharge temperature of 0°F ± 10°F in the 25 minute dwell time that [IJW] utilized in the Spiral Freezer's design.

Case 2:21-cv-00516-JPS   Filed 02/17/23   Page 12 of 25   Document 84

In addition, the dispute over the Terms and Conditions materially affects what damages are available to Palermo's should it prevail, as the Palermo's T&Cs differ from both the IJW Quote T&Cs and the IJW Standard T&Cs in this respect.

ECF No. 49 at 12. The parties also state:

[IJW] contends that certain provisions in the IJW Quote T&Cs were ultimately integrated into the parties' contract and, moreover, place responsibility on Palermo's to determine dwell time for the Rising Crusts in the Spiral Freezer. Palermo's disputes that contention and contends that [IJW] was responsible for designing the Spiral Freezer with the appropriate dwell time so that the Rising Crusts exited the freezer at the required discharge temperature.

*Id.* at 5.

As explained in detail below, the Court finds that the parties' contract is ambiguous as to which Terms and Conditions are integrated into it and, to the extent those different sets of Terms and Conditions conflict, which provisions prevail. However, although the contract is ambiguous, evidence of which party may have been contractually responsible for determining dwell time for the rising crusts is not relevant to the issues for trial or, if relevant, will cause unnecessary delay and confuse the issues. Accordingly, IJW's motion in limine will be denied; Palermo's motion in limine will be granted in part—without adopting Palermo's proffered interpretation of the contract—to the extent Palermo's seeks to preclude questioning or arguments that the parties' contract made Palermo's solely responsible for determining dwell time for the Spiral Freezer. Nonetheless, resolving the ambiguity in the parties' contract—in particular, what provisions as to damages control—will be a question for the jury if it finds for Palermo's on the question of liability.

### 4.1    Ambiguity of the Contract

Although the Court is primarily called upon to render an evidentiary ruling, it begins its analysis with the threshold question of whether the language of the parties' contract presents any triable issue of fact for the jury. The Court answers that inquiry in the affirmative.

As noted *supra* note 3, the parties agree that the package of documents sent by Palermo to IJW on June 28, 2019 functions as their contract. One component of their contract, the Palermo's T&Cs, incorporates the Quote by reference:

> 1.    **Controlling Provisions**
>
> **Generally:** The terms and conditions of this document, including the provisions on the Order, Quote and Letter, as such terms are defined in the Letter to which these terms and conditions are attached to (the "Contract"), govern the parties' duties, obligations and relationship with respect to the sale by the vendor described in the Letter ("Seller") and the purchase, acceptance and use by PALERMO VILLA, INC. ("Buyer") of the goods and/or services described in the Order (the "Products"). This Contract constitutes an offer by Buyer to buy the Products from Seller in accordance with the terms

Another component of the June 28 documents, the letter of agreement ("Letter"), also incorporates the Quote by reference:

> This letter (the "Letter") sets forth our understanding regarding products (the "Products") to be provided to Palermo Villa, Inc. ("Palermo") by IJ White Systems. ("you"), as more fully described on the following attached documents: (i) the purchase order (the "Order"); (ii) the quote (the "Quote"); and (iii) the Palermo Villa, Inc. Terms and Conditions of Purchase (the "Terms").
>
> The Order and Quote set forth the Products to be provided by you and the prices for the Products (the "Price"). The Order and Quote also set forth the agreed to timeline and delivery information for the Products. The payment terms for the Price are as established on the Terms.
>
> The agreement between us is governed by this Letter, the Order, the Quote and the Terms, and pursuant to Section

Case 2:21-cv-00516-JPS   Filed 02/17/23   Page 14 of 25   Document 84

I of the Terms, no other terms or conditions apply to our agreement.

In turn, the parties disagree over the extent to which provisions of the IJW Quote T&Cs—which were attached to the Quote when IJW provided it to Palermo's *before* the Palermo's T&Cs were negotiated but were not attached to the Quote as it was appended to the June 28 package of documents—are relevant to their contract. The Court finds that the contract is ambiguous as to whether and to what extent the IJW Quote T&Cs—initially attached to the Quote, which itself was later explicitly incorporated into the June 28 contract documents—were, themselves, incorporated into the parties' contract in any part. The contract is "fairly susceptible of more than one construction" in this regard. *Mgm't Computer Servs.*, 557 N.W.2d. at 75.

On one hand, the Letter indicates that "no other terms or conditions apply to our agreement"—this seems, straightforwardly enough, to head off any contention that the IJW Quote T&Cs continued to be in effect in any way. *See Tufail*, 833 N.W.2d at 593 (noting that contract terms are construed according to their plain meaning). Why would such language be included, and eventually agreed to by IJW, if the parties intended for multiple sets of Terms and Conditions, such as those in the IJW Quote T&Cs, to remain in effect? The June 28 package of documents also does not append the IJW Quote T&Cs anywhere.

It is also significant that IJW signed the Letter, agreeing to this exclusionary phrase, in November 2019, well after the parties made further revisions to the Palermo's T&Cs and after IJW was aware of, and did not challenge, Palermo's rejection of the inclusion of the IJW Standard T&Cs in seven change order addenda to the parties' contract. IJW did not insist, even

Case 2:21-cv-00516-JPS   Filed 02/17/23   Page 15 of 25   Document 84

as the parties added to and amended certain terms in the Palermo's T&Cs in the fall of 2019, on returning to negotiate its own IJW Quote T&Cs or IJW Standard T&Cs any further. In other words, IJW's conduct is consistent with an acknowledgement that no other set of Terms and Conditions besides the Palermo's T&Cs applied to the parties' agreement. Unfortunately, though, IJW's conduct does not end the debate—even if the Court could properly consider this extrinsic evidence to decide the present motion—because the language of the parties' contract is susceptible to another meaning.

The Palermo's T&Cs in turn state that "[t]he terms and conditions of this document, *including the provisions on the . . . Quote . . .* govern the parties' duties, obligations, and relationship with respect to the sale by [IJW] and the purchase, acceptance and use" of the Spiral Freezer by Palermo's. The IJW Quote T&Cs can fairly be considered "provisions *on* the Quote," *see Tufail*, 833 N.W.2d at 593 (noting that contract terms are construed according to their plain meaning)—they were attached thereto and Palermo's presumably took notice of them when it sought IJW's initial bid in May 2019.[6] The Palermo's T&Cs do not define or describe "the Quote." The parties' references to the Quote in the Letter and the Palermo's T&Cs do not expressly or affirmatively indicate that the IJW Quote T&Cs attached to and appearing "on" the original Quote were rejected and replaced by the Palermo's T&Cs. The parties could have, but did not, state that the Quote

---

[6]The Court again stresses that *only* the Product Specification Sheet from the Quote was included in the June 28 package of documents. The IJW Quote T&Cs were not attached the Quote as reproduced in the June 28 package of documents. *See* ECF No. 47-7 at 45.

was referenced only for certain substance or was referenced only to the extent it was reproduced in the June 28 package of documents. Nor did the parties limit the manner in which the Quote was incorporated (but could have, for example, stated in the Palermo's T&Cs or the Letter that "the Quote is integrated only to the extent it provides product specifications and enumerates what is included in the purchase"). Likewise, these sophisticated parties could have—but failed to—explicitly disclaim any Terms and Conditions originally attached to the Quote.[7]

---

[7]Both parties also argue that the contract was fully integrated and intended to be the final expression of their agreement. ECF No. 49 at 27–28 (Palermo's arguing that the Letter, which is part of the parties' contract, "provide[s] unambiguously that the Palermo's T&Cs control and that the rejected IJW T&Cs are not included in the contract"); ECF No. 82 at 1, n.1 (IJW arguing that "the contract is unambiguous as far as incorporating the Quote without limitation"). They disagree, however, as to what evidence may be considered to determine whether the contract was fully integrated. Palermo's argues "[p]arol evidence is always admissible . . . to show whether the parties intended to assent to the writing as the final and complete (or partial) statement of their agreement." ECF No. 49 at 27 (quoting *Fed. Dep. Ins. Corp. v. First Mortg. Inv.*, 250 N.W.2d 362, 366 (Wis. 1977)). IJW provides supplemental authority at the invitation of the Court, ECF No. 82-1 at 4, which states that extrinsic or parol evidence "is not admissible when the written agreement embodies written terms excluding additional understandings or agreements not contained in the writing" and that "[a]bsent claims of duress, fraud, or mutual mistake, a written provision which expressly negatives collateral or antecedent understandings makes the document a complete integration." *In re Spring Valley Meats, Inc.*, 288 N.W.2d 852, 855–56 (Wis. 1980).

The Court finds that the parties' contract is integrated. The Palermo's T&Cs—part of the June 28 package of documents that the parties agree forms their agreement—provide that "this contract constitutes the final written expression of the terms between [Palermo's] and [IJW] regarding the [Spiral Freezer] and is the complete and exclusive statement of those terms. Any terms, conditions, negotiations, or understandings between the parties which are not contained herein shall have no force or effect[.]"

Palermo's misstatement of the law notwithstanding, the parties are feuding over the wrong question—the question is not whether the contract (in the

Case 2:21-cv-00516-JPS   Filed 02/17/23   Page 17 of 25   Document 84

As Palermo's indicated during oral argument, IJW negotiated extensively with Palermo's over the Palermo's T&Cs and, through those negotiations, (1) obtained the inclusion of certain provisions that mirrored language in its IJW Quote and/or Standard T&Cs and (2) obtained the inclusion of several other provisions, such as payment terms, that were more favorable to IJW than what Palermo's initially suggested. *See* ECF No. 81 at 27–42. This conduct points to a conclusion that IJW itself never sincerely intended the IJW Quote T&Cs to be included in the parties' contract. However, this and other extrinsic evidence is for a jury at trial— not the Court on a non-dispositive motion—to consider in determining what the parties intended their contract to mean.

At the motion hearing, the parties additionally presented competing arguments about the so-called "hierarchy provision," which states:

herein. Seller shall manufacture, produce, deliver and provide the Products in conformance with the Palermo Villa, Inc. Electrical and Control Systems Design/Build Standard attached as **Exhibit A**, the Palermo Villa, Inc. Factory Acceptance Test Standard attached as **Exhibit B**, the Palermo Villa, Inc. Mechanical Design/Build Standard attached as **Exhibit C**, the PVI Sanitary Design Procedure attached as **Exhibit D**, the specifications on the Order, the specifications on the Quote, and any other specifications or quality standards attached to the Letter or provided by Buyer to Seller (collectively, the "Specifications"). In the event of a conflict between the Exhibits, these terms, the Order and/or the Quote, the documents will have the following order of precedence, unless and only to the extent expressly provided to the contrary elsewhere: (1) the Order; (2) the Quote; (3) the Exhibits; and (4) these terms. If this document is deemed an acceptance of a prior offer

IJW argues that this language demonstrates that the parties contemplated that multiple documents, including the IJW Quote T&Cs initially attached to the Quote, were integrated into the parties' contract and potentially would conflict, and that this hierarchy provision would not have been

---

form of the June 28 package of documents) is integrated as the final manifestation of the parties' agreement. It was. The question is rather *which* documents were incorporated by reference into that final agreement and, more importantly, to what extent. This is what is ambiguous from the face of the parties' agreement. The additional authority IJW provides does not help resolve this issue without further briefing.

Case 2:21-cv-00516-JPS   Filed 02/17/23   Page 18 of 25   Document 84

necessary if the Palermo's T&Cs displaced all other sets of Terms and Conditions. Palermo's argues that this provision only exists to resolve potential conflicts between the referenced Exhibits and the Order, Quote, and Terms.

It strikes the Court that IJW has the upper hand in this respect—Palermo's argument does not find strong support in the contract language. To adopt Palermo's interpretation, the language would probably need to say something like, "In the event of a conflict between the Exhibits *and* these terms, the Order, and/or the Quote…". In other words, Palermo's proffered reading of this provision would require the Court to read in language that the parties did not include. This additional example of linguistic ambiguity further demonstrates why a jury—apprised of all relevant facts, much of which is extrinsic to the parties' agreement and which was presented at oral argument—needs to determine the meaning of the parties' contract.

Ultimately, though IJW's position that the IJW Quote T&Cs were integrated into the parties' contract requires the factfinder to accept that the parties' agreement is governed by multiple sets of Terms and Conditions, it is not inconceivable that two sophisticated business entities could or might have operated under such an arrangement or could have understood the contract language to mean as such. *See Tufail*, 833 N.W.2d at 593 (stating that a provision in a business contract should be construed in "the manner that it would be understood by persons in the business to which the contract relates"). This result, therefore, is one of two or more reasonable constructions of which the parties' contract is "fairly susceptible." *Mgm't Computer Servs.*, 557 N.W.2d. at 75.

Case 2:21-cv-00516-JPS   Filed 02/17/23   Page 19 of 25   Document 84

Based on the foregoing, it is simply not clear from the words in the parties' contract that only the Palermo's T&Cs control. Whether this was intentional or merely the result of poor drafting does not change the Court's analysis or the outcome at this juncture.

### 4.2 Exclusion of Evidence of Contractual Responsibility for Dwell Time

The Court's finding that the parties' contract is ambiguous, however, does not automatically entitle IJW to present at trial any and all evidence related to its preferred interpretation of the contract. Even without determining the meaning of the contract and the intent of the parties to incorporate or repudiate certain sets of Terms and Conditions, the Court concludes that any argument, questioning, or suggestion by IJW that Palermo's was contractually responsible for determining an accurate dwell time for the rising crusts in the Spiral Freezer is irrelevant to IJW's liability.

IJW asserts its liability to Palermo's is limited or nonexistent because "it relied on a misrepresented dwell time based on product testing performed by Palermo's to build the Spiral Freezer." ECF No. 61 at 2 (Parties' Joint Pretrial Report, summarizing facts, claims, and defenses in the case). IJW argues "that the contract placed responsibility on Palermo's to determine [through product testing] the appropriate dwell time for the rising crusts in the Spiral Freezer, and that the reason the freezer does not meet the specifications" to freeze the crusts at a rate of 150 crusts per minute, to a temperature of 0°F ± 10°F, within 21–25 minutes at a temperature of -22°F "is due to the dwell time being too short." *Id.* Accordingly, IJW asserts it is not responsible for any damages Palermo's

Case 2:21-cv-00516-JPS   Filed 02/17/23   Page 20 of 25   Document 84

incurred that arose from Palermo's provision of an inaccurate dwell time (rather than from any defect in the Spiral Freezer itself). *See id.* at 2, 4.

IJW's argument that the contract should be interpreted this way relies on a cascade of cross-references. In IJW's view, the Palermo's T&Cs (indisputably a central component of the parties' agreement) integrate the Quote, which includes the Product Specification Sheet, stating that "[p]roduct testing can be performed to determine actual freezing time and confirm system size and price." The Quote in turn integrates the IJW Quote T&Cs, which themselves state:

> The product discharge temperature is estimated and it is agreed by the customer that the residence time and air temperature in the system are sufficient to meet the customer's requirements. By design, in all ambient cooling, refrigerated cooling and freezing applications, the product will discharge with a colder surface temperature and a warmer core temperature. After exiting the IJW System, the product will potentially equilibrate to within a range temperature.

IJW argues that the above language both (1) made Palermo's responsible for testing and determining the appropriate dwell time and (2) was agreed upon and incorporated by reference into the parties' contract.

This language—even if fully incorporated into the parties' agreement—is frankly of little use in determining IJW's liability. IJW represented to Palermo's, early in the bidding process and then in the Quote, that it could produce a Spiral Freezer capable of freezing Palermo's rising crusts at the specified rate of 150 crusts per minute, to the specified temperature of 0°F ± 10°F, with a dwell time of about 25 minutes. The Spiral Freezer that Palermo's now has can "freeze approximately 140 crusts per minute, down to a temperature of roughly 13°F, and it takes 29 minutes to do so." ECF No. 49 at 32. IJW has not provided a Spiral Freezer that meets the specifications to which it agreed. The question of dwell time—

Case 2:21-cv-00516-JPS   Filed 02/17/23   Page 21 of 25   Document 84

regardless of which party was responsible for determining it—is more or less a sideshow to the main event of whether and why IJW's Spiral Freezer cannot freeze rising crusts to any of the specifications in the parties' contract. Further evidence in the record as well as the information presented at oral argument confirm that, to whatever extent Palermo's may have agreed to or been responsible for providing a specific dwell time, it was ultimately IJW that promised a product that it has not been able to deliver.[8]

The May 2019 discussions between Mr. Moranski and Mr. Amacker make clear that neither party ever provided a concrete dwell time figure—Moranski stated only that he "assumed" Palermo's would want a Spiral Freezer capable of meeting the specifications at a dwell time of 30 minutes, and Mr. Amacker represented that IJW could meet whatever dwell time Palermo's indicated. Palermo's stated in oral argument, "what Palermo's was looking for was the ability to freeze the crusts at a rate of 150 per minute, no matter how long it took. If [IJW] thought it's going to take 40 minutes . . . that's what Palermo's wanted the design to be." ECF No. 81 at

---

[8]Third Party Defendant Kuhlman, Inc. has filed its own motion in limine which, like Palermo's and IJW's motion in limine related to contract interpretation, is functionally a dispositive motion. Kuhlman's motion argues that IJW's third-party indemnification and contribution claims against it are either not legally valid under Wisconsin law or barred by the economic loss doctrine, and, accordingly, evidence related to these claims should not be admitted at trial. ECF Nos. 52, 53. The crux of IJW's allegations against Kuhlman, according to IJW's expert, is that the refrigeration valves Kuhlman selected were too small, which lowered the capability of the Spiral Freezer to freeze the rising crusts at Palermo's specifications. ECF No. 53 at 2. The Court's findings on Palermo's and IJW's present motion in limine do not bear on any potential resolution of Kuhlman's motion in limine or the allegations against Kuhlman.

16. Granted, these facts do not square neatly with Palermo's contention in its Complaint that it "provided no other specifications for the design of the Spiral Freezer" besides these figures, and that "all other specifications for the Spiral Freezer," including the dwell time, "were created, established, designed, provided, and calculated by [IJW.]" ECF No. 1 at 6. Palermo's did provide its "assumption" that the dwell time should be 30 minutes at most, but never demanded this particular specification, let alone 25 minutes.

And ultimately, it was IJW that volunteered on the Product Specification Sheet that it could provide a Spiral Freezer capable of meeting the volume and exit temperature specifications at a dwell time of 25 minutes—well below anything Palermo's ever requested. IJW further allowed that Product Specification Sheet to be incorporated into the Quote which, in turn, became part of the parties' contract as executed in November 2019.[9]

Based on these facts, why would IJW represent, in writing, that it could produce a Spiral Freezer with an estimated dwell time *shorter* than anything Palermo's ever requested, if IJW did not think it was possible to deliver on that representation? And why should IJW now be able to allege that any other party's promise besides its own is the reason the Spiral

---

[9] As noted *supra* note 6, the June 28 package of documents includes only the Product Specification Sheet and the trailing notation that specifies that "[p]roduct testing can be performed to determine actual freezing time and confirm system size and price" without specifying which party is to perform testing. See ECF No. 47-7 at 45. So—even considering that the parties' contract as eventually executed states "product testing can be performed"—IJW also clearly agreed therein that it would provide a Spiral Freezer capable of meeting the stated specifications, including a 25 minute dwell time, regardless of who performed the testing of that dwell time.

Freezer does not live up to expectations? The Court reiterates and fully recognizes that both Palermo's and IJW were first-timers in the business of contracting for and building a Spiral Freezer for freezing this particular type of rising crust product (and additionally that neither party can alter the laws of thermodynamics). But whether the Spiral Freezer's failure to meet the represented projected dwell time was based on a flawed front-end miscalculation of that dwell time by IJW—which has long been in the freezing business—or a flaw or defect in the machine itself, the fact remains that the Spiral Freezer does not do what IJW said it would.

More to the point: whether Palermo's was contractually responsible for the dwell time does not make it more or less probable that IJW is liable for the Spiral Freezer's failure to meets those specifications. *See* Fed. R. Evid. 401. Even if Palermo's was responsible for providing that figure, IJW could still be liable because its Spiral Freezer does not meet the only dwell time *Palermo's* can be said to have specified— "30 minute[s] max"—in addition to not meeting the specified exit temperature and rate of crusts per minute. Descending into a rabbit hole of contract interpretation on this topic would do nothing to answer the question of liability, but would expend significant resources and unnecessarily complicate and delay trial, *see Allen*, 2021 WL 1092804, at *1, and moreover is likely to obfuscate the core issue of whether IJW's Spiral Freezer can perform as IJW said it would. *See* Fed. R. Evid. 403. For these reasons, the Court will grant Palermo's motion in limine in part and preclude IJW from arguing, questioning, or suggesting that Palermo's was contractually responsible for determining an accurate dwell time for the rising crusts in the Spiral Freezer.

Case 2:21-cv-00516-JPS   Filed 02/17/23   Page 24 of 25   Document 84

**5.    CONCLUSION**

The Court resolves the parties' competing motions in limine related to contract interpretation as set forth above. Since the Court has declined to fully embrace either party's preferred reading of the contract, the parties will still be able to argue and attempt to persuade the jury as to which set or sets of Terms and Conditions are controlling with respect to available damages. However, the Court finds that the question of which party, if any, was made contractually responsible for determining and providing an accurate dwell time for the Spiral Freezer is a non-starter. The parties must therefore present their evidence, questioning, and argumentation at trial consistently with the terms of this Order.

Accordingly,

**IT IS ORDERED** that Plaintiff Palermo Villa, Inc.'s motion in limine, ECF No. 45, be and the same is hereby **GRANTED in part** as stated in this Order; and

**IT IS FURTHER ORDERED** that Defendant I.J. White Corporation's motion in limine, ECF No. 54, be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 17th day of February, 2023.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge

Page 25 of 25